IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

LINDSEY M. BARR,                    )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )      CASE NO. CV422-226
                                    )
HEATHER TUCKER, in her official )
and personal capacities as          )
Principal of McAllister             )
Elementary School; DEBI MCNEAL, )
in her official and personal        )
capacities as Director of Human )
Resources for Bryan County          )
Schools; and PAUL BROOKSHER, in )
his official and personal           )
capacities as Superintendent of )
Bryan County Schools;               )
                                    )
        Defendants.                 )
                                    )
_____ )

## O R D E R

Before the Court is Plaintiff Lindsey M. Barr's Motion for
Preliminary Injunction and Expedited Hearing (Doc. 8), which
Defendants Heather Tucker, Debi McNeal, and Paul Brooksher have
opposed (Doc. 17). Plaintiff's Request for Hearing (Doc. 16) is
also before the Court. For the following reasons, Plaintiff's
motions (Docs. 8, 16) are **DENIED**.

### BACKGROUND

This case arises from Plaintiff's removal as a substitute
teacher in Bryan County Schools ("BCS") allegedly for expressing
her religious views about a book containing same-sex families being

presented to her children at McAllister Elementary School ("MES"),
a Bryan County elementary school located in Richmond Hill, Georgia.
(Doc. 1 at ¶¶ 1, 10, 11, 55.) As alleged in Plaintiff's Complaint,
Plaintiff and her husband are "professing Christians who desire to
raise their children according to their sincerely held religious
beliefs, including their beliefs that marriage should be between
one man and one woman, and that family formation should occur
within the confines of heterosexual marriage." (Id. at ¶ 23.)
Plaintiff and her husband have three children, and two of them
attend MES. (Id. at ¶ 22.) After previously working as a full-time
teacher with BCS from 2008 through 2018, Plaintiff was hired by
BCS as a substitute teacher in January 2022. (Id. at ¶¶ 19, 24.)

In April 2022, when Plaintiff was working as a substitute at
MES in the classroom of one of her children (Doc. 8, Attach. 2 at
11; Doc. 18, Attach. 1 at ¶ 3),[1] Plaintiff took a picture of a
poster hanging in the classroom (Doc. 1 at ¶ 43). The poster
included a drawing of two men with "a heart floating between them"
and the caption: "All adults have the right to marriage and to
raise a family." (Doc. 1 at ¶ 43; Doc. 1, Attach. 6 at 3.) Plaintiff

---

[1] "At this stage, 'a district court may rely on affidavits and
hearsay materials . . . if the evidence is "appropriate given the
character and objectives of the injunctive proceeding." ' " Ga.
Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of
Registrations & Elections, No. 1:20-CV-1587-WMR, 2020 WL 2505535,
at *2 (N.D. Ga. May 8, 2020) (quoting Levi Strauss & Co. v. Sunrise
Int'l Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995)).

sent the picture to another parent.[2] (Doc. 17, Attach. 1 at 2; Doc. 18, Attach. 1 at ¶ 3.) No MES official raised any concern about the picture to Plaintiff at that time or during the 2021-22 school year. (Doc. 18, Attach. 1 at ¶ 3.)

At the beginning of the 2022-23 school year, Plaintiff learned of a "read-aloud program" at MES, in which the school's librarian would present the same book to every class in the school. (Doc. 1 at ¶ 34.) Plaintiff learned that one book to be used in the read-aloud program was "All Are Welcome," a picture book that contains "illustrations [that] picture same-sex couples with school-age children[.]" (Id. at ¶¶ 34, 36.)

On the night of Monday, August 15, 2022, Plaintiff sent a message to her child's teacher regarding the read-aloud program. (Doc. 18, Attach. 1 at 3, 7.) Plaintiff inquired into the conversations surrounding the "book, story and various illustrations[.]" (Id. at 7.) When Plaintiff discovered the librarian had not read the book to her child's class, she responded that she was glad and that it was "[g]oing to be a hard pass for the Barr fam." (Id. at 7-8.)

---

[2] Defendant Heather Tucker alleges that Plaintiff claimed the poster was throughout the school, resulting in the parent questioning another teacher about the poster (Doc. 17, Attach. 1 at 2), but Plaintiff disputes that she claimed the poster was located throughout the school (Doc. 18, Attach. 1 at ¶ 3).

On Tuesday, August 16, 2022, when Plaintiff was working at the school as a substitute, but at a time Plaintiff contends she was not performing any duties as a substitute,[3] Plaintiff asked her other child's teacher to excuse him or her from the read-aloud program. (Doc. 1 at ¶ 39.) According to Defendant Tucker, Plaintiff did so in the presence of students (Doc. 17, Attach. 1 at 2), but Plaintiff contends no one was around at the time (Doc. 18, Attach. 1 at 4). That same day, at 11:53 a.m., Plaintiff emailed MES principal, Defendant Tucker, to request a conversation. (Doc. 1 at ¶ 38; Doc. 1, Attach. 5 at 2.) In a subsequent email to Defendant Tucker at 4:25 p.m., Plaintiff explained that she was concerned about the "read aloud for the week" and that she "wanted to chat with [Defendant Tucker] about the illustrations and potential conversations." (Doc. 1 at ¶ 38; Doc. 1, Attach. 5 at 3.)

---

[3] While Plaintiff contends that she was "off duty" and "off the clock" when she asked her child's teacher to excuse him or her from the read-aloud program in her motion for preliminary injunction (Doc. 8, Attach. 1 at 9, 18), Plaintiff specifies in her complaint that she talked to her child's teacher "at a time when she was not performing any duties as a substitute." (Doc. 1 at ¶ 39.) Specifically, Plaintiff claims this was at 7:00 a.m., before her job duties began. (Doc. 18, Attach. 1 at ¶ 5.) Citing Georgia's one-party consent statute, O.C.G.A. § 16-11-66(a), Plaintiff made an audio recording of a subsequent meeting between Plaintiff, Defendant Tucker, and Defendant McNeal and attached the transcript as an exhibit. (Doc. 8, Attach. 1 at 10 n.1.) At this stage, Defendants do not object to Plaintiff's use of this transcript and cite to it in their response. (Doc. 17 at 8 n.3.) According to Plaintiff's submission, Plaintiff purportedly said: "You're right. There is nothing I can say other than I'm sorry. I did go to my children's teachers specifically while I was here [at MES] as a sub." (Doc. 8, Attach. 2 at 11-12.)

On Wednesday, August 17, 2022, when Plaintiff was at home and not working, Plaintiff and Defendant Tucker had a conversation over the telephone. (Id. at ¶¶ 40, 41.) Plaintiff told Defendant Tucker that she believed the book was "inappropriate for young children, conflicted with her Christian faith, and appeared to be an effort to indoctrinate young children into a progressive ideological agenda[]" and asked that her children be excused from the read-aloud program. (Id. at ¶¶ 41, 42.) After the August 17, 2022, phone call, Plaintiff sent Defendant Tucker the picture of the poster she had taken while serving as a substitute in her child's classroom in April 2022 and conveyed:

> I'm not trying to make waves with anyone. I'm trying to protect my children. This is an agenda. This is not ok. If I couldn't post bible verses in my newsletters or read scripture to my classes or cover my students aloud in prayer, this shouldn't be allowed either. It isn't equity and diversity. It's propaganda. You do not have to agree with me, but I appreciate you having the conversation and allowing me to see your perspective as a public school administrator.

(Doc. 1 at ¶ 43; Doc. 1, Attach. 6 at 2.)

On Thursday, August 18, 2022, Plaintiff could not access the system she used to obtain substitute teaching assignments. (Doc. 1 at ¶ 47.) That day, Plaintiff emailed Defendant Tucker and asked whether she had been removed as a substitute teacher at MES and whether she was banned as a volunteer at the school. (Doc. 1 at ¶ 47; Doc. 1, Attach. 7 at 2.) On Friday, August 19, 2022, Defendant McNeal, BCS Director of Human Resources, emailed Plaintiff that

Defendants Tucker and McNeal wanted to meet with her regarding her role as a substitute. (Doc. 1 at ¶ 49; Doc. 1, Attach. 8 at 2.)

The group arranged to meet on Tuesday, August 23, 2022. (Doc. 1 at ¶ 50.) Defendant Tucker informed Plaintiff that she had shared biases that she was "bringing in with [her] and that [were] coming up during the times that [Plaintiff was] working [at MES] and substituting. One of those [biases was] against same-sex couples."[4] (Doc. 1 at ¶ 51; Doc. 8, Attach. 2 at 8.) Defendant Tucker informed Plaintiff that she had concerns about whether Plaintiff would be able to support "a student that identifies as gay, or has parents that identify as gay" since "those biases are still entering into the workplace as well." (Doc. 1 at ¶ 51; Doc. 8, Attach. 2 at 8-9.) Defendant Tucker also informed Plaintiff her other concern was that she had "teachers requesting that [Plaintiff] not be subbing in their classroom[,]" and it was becoming more difficult to honor that request. (Doc. 8, Attach. 2 at 9.)

Plaintiff responded to Defendant Tucker that she was expressing her concerns as a Christian mother, not as a substitute teacher, and that she did not think that they "should be pushing same-sex marriage on [her] children." (Doc. 1 at ¶ 52; Doc. 8, Attach. 2 at 9-10.) Defendant Tucker responded that Plaintiff's

---

[4] The parties also discussed potential bias against multiracial families that is not at issue in this motion. (Doc. 8, Attach. 2 at 9-10.)

concerns were not brought "just as a parent" and referenced the picture of the poster taken when Plaintiff was substituting in a classroom the previous year. (Doc. 8, Attach. 2 at 10.) Plaintiff clarified: "It was in my child's classroom. I do feel like that needs to be said. . . . I was subbing in my own child's class, reading a book, felt a little like, 'oh I don't really love this' and then noticed the poster. . . ." (Id. at 11.) Later, when discussing the purpose of the meeting, Plaintiff explained that she was "tr[ying] to find [out], . . . can I prevent my children from being a part of this? 'Yes' or 'no.' " (Id. at 12.)

Ultimately, Defendant Tucker informed Plaintiff that she had instructed Defendant McNeal to remove Plaintiff as a substitute teacher at MES, Plaintiff's children would be excused from the read-aloud program, and Plaintiff could continue to volunteer at MES, although another conversation might be necessary if incidents occurred. (Doc. 1 at ¶¶ 53, 65.) Plaintiff alleges that Defendant McNeal extended Plaintiff's termination to all Bryan County schools. (Id. at ¶ 5.) Plaintiff further contends Defendant Brooksher, BCS Superintendent, ratified Plaintiff's termination. (Id. at ¶¶ 5, 16, 61.)

**LEGAL STANDARD**

Generally, courts are permitted to grant a preliminary injunction after considering whether a plaintiff can demonstrate "(1) a substantial likelihood of success on the merits; (2) that

irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003) (citations omitted). "It is well-established in this Circuit that a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to all four elements." CBS Broad., Inc. v. EchoStar Commnc'ns Corp., 265 F.3d 1193, 1200 (11th Cir. 2001) (quotation marks omitted) (quoting Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000)).

"[A]n evidentiary hearing is not always required before the issuance of a preliminary injunction[.]" Four Seasons Hotels & Resorts, B.V., 320 F.3d at 1211 (citations omitted). "[W]here facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held." Id. (quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1312 (11th Cir. 1998)). In cases where there is little dispute as to raw facts and the dispute revolves around the inferences to be drawn from such facts, whether an evidentiary hearing is necessary is left "to the sound discretion of the

district court." McDonald's Corp., 147 F.3d at 1313 (quotation omitted).

Otherwise, "[w]hen ruling on a preliminary injunction, 'all of the well-pleaded allegations [in a movant's] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true.' " Henry v. Abernathy, No. 2:21-CV-797-RAH, 2022 WL 17812823, at *1 (M.D. Ala. Dec. 19, 2022) (quotation omitted); Elrod v. Burns, 427 U.S. 347, 350 n.1, 96 S. Ct. 2573, 2679 n.1, 49 L. Ed. 2d 547 (1976). Moreover, as previously noted, the Court may consider "affidavits and hearsay materials . . . if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.' " Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registrations & Elections, No. 1:20-CV-1587-WMR, 2020 WL 2505535, at *2 (N.D. Ga. May 8, 2020) (quoting Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995)).

## ANALYSIS

Plaintiff brought claims against Defendants under 42 U.S.C. § 1983 for violating her constitutional rights.[5] (Doc. 1 at 13-

---

[5] To prevail in a section 1983 case, "a plaintiff must make a prima facie showing of two elements: (1) that the act or omission deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law." Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993) (quoting Bannum, Inc. v. City of Ft. Lauderdale, 901 F.2d 989, 996–97 (11th Cir. 1990)).

18.) Specifically, Plaintiff alleges Defendants violated her First Amendment rights by retaliating against her for exercising her right to free speech and violating her right to free exercise of religion.[6] (Id.) Pending final disposition of this case, Plaintiff now seeks an injunction ordering Defendants to reinstate her and refrain from taking further action against her. (Doc. 8, Attach. 1 at 7.)

I.   EVIDENTIARY HEARING

Plaintiff and Defendants disagree over whether an evidentiary hearing on Plaintiff's motion is necessary. (Doc. 16; Doc. 17 at 3.) The Court finds that this case falls into the category of cases where there is little dispute as to raw facts and the dispute revolves around the inferences to be drawn from such facts. Thus, no evidentiary hearing is required on this matter, and Plaintiff's motion for an evidentiary hearing (Doc. 16) is **DENIED.**

---

[6] Plaintiff also brought a claim for unconstitutional content or viewpoint discrimination but did not advance an argument on this claim in her motion for preliminary injunction. (Doc. 1 at 15.) In any event, the Court notes that a court in the Northern District of Georgia was asked to decide whether a plaintiff could "mount a separate viewpoint discrimination claim apart from his First Amendment retaliation claim[]" and determined "the test to evaluate a city's firing of an employee based on speech—Pickering— . . . is the most appropriate for any of Plaintiff's claims based upon his alleged speech-based firing." Cochran v. City of Atlanta, 289 F. Supp. 3d 1276, 1293, 1294 (N.D. Ga. 2017). The court granted the defendant's motion for summary judgment on the plaintiff's viewpoint discrimination claim for the same reasons the court granted the defendant's motion on the plaintiff's Free Speech retaliation claim. Id.

II.   PRELIMINARY INJUNCTION

With the standard for granting a motion for preliminary injunction in mind, the Court turns to the merits of Plaintiff's motion. As explained above, the first factor Plaintiff must show in order to receive her requested injunction is a substantial likelihood of success on the merits of her claims, and the Court will discuss each in turn. Because Plaintiff has not clearly carried her burden in establishing a substantial likelihood of success on the merits of her claims, discussion of the remaining three elements under the preliminary injunction analysis is not necessary. Keeton v. Anderson-Wiley, 733 F. Supp. 2d 1368, 1381 (S.D. Ga. 2010).

A.   Free Speech

Plaintiff first claims Defendants fired her in retaliation for exercising her First Amendment right to free speech to speak out "as a Christian, a mother, and a private citizen on a matter of public concern—namely, drawings in a picture book being presented to students at [MES], including her own young children, in the course of a library read aloud program." (Doc. 1 at ¶ 1; Doc. 8, Attach. 1 at 14.) Defendants disagree and argue that Plaintiff's claim is unlikely to succeed because Plaintiff did not speak on a matter of public concern. (Doc. 17 at 6-8.)

"A government employer may not demote or discharge a public employee in retaliation for speech protected by the First

11

Amendment." <u>Alves v. Bd. of Regents</u>, 804 F.3d 1149, 1159 (11th Cir. 2015) (citing <u>Bryson v. City of Waycross</u>, 888 F.2d 1562, 1565 (11th Cir. 1989)). On the other hand, it is "also well-settled that a public employee's free-speech rights are not absolute." <u>O'Laughlin v. Palm Beach Cnty.</u>, 30 F.4th 1045, 1050 (11th Cir. 2022) (citing <u>Bryson</u>, 888 F.2d at 1565). To strike the appropriate balance, courts in the Eleventh Circuit apply a four-step analysis based on <u>Pickering v. Board of Education</u>, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968), and its progeny.

> First, we determine whether the plaintiff's speech was made as a citizen and whether it implicated a matter of public concern. Second, if the plaintiff's speech was made as a citizen and implicated a matter of public concern, then we weigh the plaintiff's interests in free speech against the government's interest in regulating speech to promote the efficiency of the public services it performs through its employees. These first two inquiries inform whether the plaintiff's speech is protected speech under the First Amendment. Third, if the plaintiff's speech is protected speech, the plaintiff must show that his speech was a substantial motivating factor in the alleged adverse employment action. Finally, if the plaintiff makes this showing, then the burden shifts to the government to prove that it would have performed the adverse action even in the absence of the plaintiff's speech.[7]

---

[7] Plaintiff argues that after the Supreme Court's decision in <u>Kennedy v. Bremerton School District</u>, 142 S. Ct. 2407, 2426, 213 L. Ed. 2d 755 (2022), she no longer bears the burden of proof on the second prong of the analysis. (Doc. 8, Attach. 1 at 13–14.) In <u>Cotriss v. City of Roswell</u>, No. 19-12747, 2022 WL 2345729, at *9 (11th Cir. 2022), which the Eleventh Circuit decided two days after the Supreme Court issued its opinion in <u>Kennedy</u>, the Eleventh Circuit explained that the burden only shifted to the defendants after the plaintiff could make a showing on the first three elements of the test. Thus, neither <u>Millspaugh</u> nor <u>Cotriss</u> confirms

<u>Millspaugh v. Cobb Cnty. Fire & Emergency Servs.</u>, No. 22-10132, 2022 WL 17101337, at *6 (11th Cir. Nov. 22, 2022) (internal citations and quotation marks omitted).

If the employee did not speak as a citizen and on a matter of public concern, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 418, 126 S. Ct. 1951, 1958, 164 L. Ed. 2d 689 (2006) (citing <u>Connick v. Myers</u>, 461 U.S. 138, 147, 103 S. Ct. 1684, 1690, 75 L. Ed. 2d 708 (1983)). When public employees make statements pursuant to their official duties, no First Amendment protection is afforded. <u>Id.</u> at 421, 126 S. Ct. at 1960. Here, Defendants do not address or dispute Plaintiff's argument that she spoke as a citizen, not as a public employee. (Doc. 8, Attach. 1 at 14; Doc. 17 at 6-7.) Accordingly, the Court will turn to whether Plaintiff has established some likelihood of success of showing she spoke on a matter of public concern.

"An employee's speech will rarely be entirely private or entirely public." <u>Morgan v. Ford</u>, 6 F.3d 750, 755 (11th Cir. 1993). Thus, to determine whether speech relates to a matter of public concern, the Court must consider the "content, form, and context" of the statement. <u>O'Laughlin</u>, 30 F.4th 1045, 1051 (11th Cir. 2022).

---

Plaintiff's position is correct, and in any event, the issue is ultimately of no consequence in this case.

To do so, the Court asks "whether the 'main thrust' of the speech in question is essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was." Mitchell v. Hillsborough Cnty., 468 F.3d 1276, 1283 (11th Cir. 2006) (internal citations omitted).

First, "[i]n assessing the content of a public employee's speech, [the Court] look[s] to whether the speech communicates a 'subject of legitimate news interest[,] a subject of general interest and of value and concern to the public at the time." O'Laughlin, 30 F.4th at 1051 (quoting Mitchell, 468 F.3d at 1284). Content is the "most important factor in assessing whether particular speech touches on a matter of public concern." Mitchell, 468 F.3d at 1284. However, "when context and motivation are considered, even speech that, content-wise, lies near the core of the First Amendment's protection . . . may be deemed private speech." Id.

As to form, "[t]he mere fact that [an employee's] speech was made to coworkers or to supervisors rather than directed at the general public does not remove the speech from the category of public concern." O'Laughlin, 30 F.4th at 1052 (quoting Cook v. Gwinnett Cnty. Sch. Dist., 414 F.3d 1313, 1319 (11th Cir. 2005)). Nevertheless, whether the speech at issue was communicated to the

public remains a relevant, but not dispositive, consideration.
Alves, 804 F.3d at 1162.

Finally, as to context, the United States Court of Appeals
for the Eleventh Circuit has cautioned that public interest alone
in the topic of the employee's speech is "of little moment."
Morgan, 6 F.3d at 754. Instead, the Court "must determine whether
the purpose of [the plaintiff's] speech was to raise issues of
public concern, on the one hand, or to further her own private
interest, on the other." Id.; Alves, 804 F.3d at 1167 (explaining
that the relevant inquiry is "whether the purpose of [the
employee's] speech was to raise issues of public concern[,]" not
"whether the public would be interested in the topic of the speech
at issue").

　　　1.　Content

Plaintiff argues that the content of her speech addresses an
"issue of utmost public importance today – whether, when, and how
public elementary schools should address issues related to sexual
orientation, including same-sex marriage, child-bearing, adoption,
and parenting."[8] (Doc. 8, Attach. 1 at 15.) Plaintiff contends,

---

[8] The Court notes that in her complaint, Plaintiff's claim for
First Amendment retaliation is based on her allegations that she
expressed her view on "marriage, family, and the appropriateness
of a public elementary school reading her young children a picture
book with drawing of same-sex couples embracing, pregnant, and
parenting." (Doc. 1 at ¶ 72; Doc. 8, Attach. 1 at 17 ("[Plaintiff]
privately spoke to the principal and her children's teachers to
withdraw them from instruction on 'All Are Welcome.' ").)

15

and Defendants do not dispute, that the content of her speech -
addressing sexual orientation and curriculum in public education
- supports the conclusion that she spoke on a matter of public
concern. (Doc. 8, Attach. 1 at 15-16; Doc. 17 at 7; Doc. 18 at 6.)

      2.   Form

. In her motion, Plaintiff maintains that the form of her speech
and her choice to speak privately to her children's teacher and
principal do not reduce her speech to a matter of private or
personal interest. (Doc. 8, Attach. 1 at 17.) Notwithstanding,
Defendants point out the private form of Plaintiff's speech
suggests she did not speak on a matter of public concern. (Doc. 17
at 7-8.) In reply, relying on Givhan v. Western Line Consolidated
School District, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619
(1979), and O'Laughlin, Plaintiff reiterates that Supreme Court
and Eleventh Circuit precedent confirm that she did not forfeit
her free speech rights by speaking privately to her children's
teachers and principal instead of publicly. (Doc. 18 at 6.)

Plaintiff is correct that both Givhan and O'Laughlin confirm
that a public employee does not forfeit her free-speech rights
simply because she chooses to communicate privately rather than
publicly, and the Court does not find that Plaintiff is unlikely
to succeed in showing she spoke on matter of public concern because
she spoke privately to her children's teachers and principal.
Givhan, 439 U.S. at 413-14, 99 S. Ct. at 696-97; O'Laughlin, 30

F.4th at 1052. In the Court's opinion, the significance of the holdings in both of those cases is that an individual's decision to speak privately does not automatically relegate speech on a matter of public concern to speech on a private matter. Givhan, 439 U.S. at 414-415, 99 S. Ct. at 695, 696 (rejecting Fifth Circuit finding that the plaintiff's statements concerning the school district's allegedly racially discriminatory policies were not entitled to First Amendment protection merely because she expressed her complaints privately to the principal); O'Laughlin, 30 F.4th at 1052 (rejecting the district court's reasoning that the form of the plaintiffs' speech in a private Facebook group rather than to the public at large meant the speech did not address a matter of public concern). However, as the Court already explained, Eleventh Circuit cases after Givhan confirm that the method of communication remains a relevant but not dispositive inquiry. Alves, 804 F.3d at 1168. Thus, "although not dispositive to [this] inquiry," the Court notes that Plaintiff did not attempt to make her concerns public, which merely means that the way by which Plaintiff communicated her concerns comes down in favor of speech on a private, rather than public, matter. Id.

### 3. Context

Finally, Plaintiff argues the context of her speech shows she spoke on a matter of public concern because it centered around topics currently part of an ongoing national debate. (Doc. 8,

Attach. 1 at 15-16.) Relying on Morgan, Defendants respond that the main thrust of Plaintiff's private statements to her children's teachers and principal was to keep **her children** from participating in the read-aloud program, not to raise issues of public concern. (Doc. 17 at 7-8.) In reply, Plaintiff counters that the cases purportedly showing that the context of her speech suggests she spoke on a matter of personal interest are limited to instances in which the employee spoke "as an employee" about improving conditions of employment. (Doc. 18 at 7 ("[T]he Eleventh Circuit has made clear . . . that speaking on a matter of personal interest, as opposed to one of public concern, relates to whether the employee spoke for herself **as an employee**.' ").) Instead, Plaintiff maintains that she spoke " 'to keep her children from participating in the reading of a book,' which violated her sincerely held religious beliefs." (Id.) Moreover, Plaintiff argues that the Eleventh Circuit's evaluation of context in O'Laughlin shows that her personal motivation regarding restricting her own children's exposure did not relegate her speech from a matter of public concern on the larger debate of school curriculum and sexual orientation to one of personal interest. (Id. at 7-8.)

First, the Court rejects Plaintiff's argument that the question of whether speech relates to a matter of public concern or personal interest only applies to work-related speech. See Cottrell v. Chickasaw City Schs. Bd. of Educ., 307 F. Supp. 3d

1264, 1268, 1275-78 (S.D. Ala. Feb. 7, 2018) (addressing whether school system employees who spoke about the high school principal assaulting their son spoke on a matter of public concern). Thus, the Court will address whether, at this stage, Plaintiff is likely to succeed in showing the context of her speech suggests she spoke on a matter of public concern.

In Morgan, the case Defendants advance in support of their argument, plaintiff Jacqueline Morgan, a Department of Corrections employee, claimed that she was retaliated against for complaining about sexual harassment by her supervisor. 6 F.3d at 751. After serving as a corroborating witness for her co-worker's grievance against their mutual supervisor, Morgan filed her own complaints with Internal Affairs and the Georgia Office of Fair Employment Practices. Id. at 752-53. Morgan claimed officers subsequently made her working environment unpleasant to the point that she resigned. Id. at 753.

Morgan argued that her complaints of sexual harassment constituted speech on a matter of public concern because they related to "a matter of vital social interest." Id. at 754. The Eleventh Circuit agreed with Morgan but explained that "the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment." Id. (quotation omitted). Instead, the Court emphasized that the relevant inquiry is "whether the purpose of [the

plaintiff's] speech was to raise issues of public concern . . . or to further her own private interest[.]" Id. The court reasoned that Morgan's speech largely focused on her supervisor's behavior and its effect on her work, did not draw "the public at large or its concerns into the picture[,]" and "was driven by her own entirely rational self-interest in improving the conditions of her employment." Id. at 755.

Plaintiff cites Belyeu v. Coosa County Board of Education, a case in which the Eleventh Circuit explained that "the curriculum of a public school . . . is a topic worthy of public debate[,]" in support of her argument that the content and context factors suggest she spoke on a matter of public concern. 998 F.2d 925, 929 (11th Cir. 1993) (citation omitted); (Doc. 8, Attach. 1 at 16; Doc. 18 at 7). Not only is Belyeu distinguishable, but it also introduces the distinction at issue.

In Belyeu, plaintiff Jackie M. Belyeu claimed she was not rehired as a teacher's aide in retaliation for her speech. 998 F.2d at 927. After agreeing with the district court that Belyeu spoke on a matter of public concern when she addressed Central High School's "failure to have some program or other commemoration of Black History Month" at a public meeting as a parent of a child attending the school, the Eleventh Circuit primarily addressed the Pickering balancing test. Id. at 927, 928-929. Although not part of the Eleventh Circuit's analysis, this Court finds important the

20

district court's treatment of Belyeu's speech in another dispute with the school system. Specifically, "Belyeu [also] engaged in several emotional conferences" with her child's English teacher and principal in which she alleged the teacher "awarded grades based on a student's race[.]" Id. at 927. The Eleventh Circuit noted that the "district court considered Belyeu's speech concerning . . . her child's English grade to address matters of private interest . . . ." Id. at 928.

When Belyeu spoke about the high school's failure to have a program commemorating Black History Month, she "expressed her concern that all students, black and white," not only her own child, "should be informed of the contributions of black Americans[,]" and both the Eleventh Circuit and district court agreed it addressed a matter of public concern. Id. at 927, 928. In contrast, even though Belyeu's speech about her child's grade concerned racial discrimination, which the Eleventh Circuit described as "a matter inherently of public concern[,]" the district court found it addressed a matter of private interest. Id. at 928, 929.

Cases evaluating how the dual role of parent and teacher influences the assessment of the context factor are sparse, but a few courts, both within and outside the Eleventh Circuit, have encountered the issue. In Cottrell, a district court in this Circuit considered whether several statements by school employees

about a principal striking a student, including statements by the student's parents, were matters of public concern. 307 F. Supp. 3d at 1268, 1275, 1277, 1278. Ronald Cottrell, James Rigdon, and Stacey Rigdon were employees of the school system in which the Rigdon's son was a high school student. Id. at 1268. One day, the principal of the high school struck the Rigdon's son in front of other teachers. Id. Among other statements, Cottrell reported the incident to the president of the school board and superintendent, and the Rigdons raised the issue in response to other problems that arose concerning Mr. Rigdon's classroom and the son's behavior. Id. at 1268-69. All were terminated. Id. at 1270.

All three argued "the subject matter—physical abuse of a student by a public school principal—is a matter of public concern." Id. at 1275, 1277. Assuming Cottrell spoke as a citizen when he verbally reported what happened, the court noted "there [were] no facts to suggest that Cottrell's purpose in making these reports was to raise an issue of public concern as the reports were made verbally to single individuals (superiors) with no obvious expectation of bringing the matter to public light." Id. at 1275.

The court reached the same conclusion for the parents' statements. Id. at 1277, 1278. While acknowledging the absence of details regarding many of the statements, the court also explained that:

> Plaintiffs' argument that "Plaintiffs exercised their right to free speech by talking publicly about the assault on their child" . . . tends to suggest that any speech made by a citizen related to any matter that may potentially be a concern of the public is protected. Such a contention is misguided and the correct analysis requires a review of the purpose for which the speech was made.

Id. at 1277. As for Ms. Ridgon's speech, the court assumed she spoke as a citizen when she reported the incident to the Alabama Department of Education, discussed the incident during a meeting, and generally discussed the incident with unidentified people. Id. Nevertheless, the court emphasized there was "no indication that these statements were made in a public forum, for non-personal reasons, or with the intent to raise public awareness[]" and found insufficient factual support to conclude her speech was protected based on its content, form, and context. Id.

The Court also finds the Northern District of New York's analysis in Henderson v. Greenville Central School District, No. 1:19-cv-0866 (LEK/CFH), 2021 WL 1946379 (N.D.N.Y. May 14, 2021), instructive. In that case, the court found that a teaching aide's speech on the safety of her son at school due to the enrollment of a potentially dangerous student did not address a matter of public concern. Id. at *1, *4. At a time plaintiff Rachel Henderson was not working as a teaching aide, she attended her son's open house. Id. at *1. Henderson first spoke to her son's PE teacher, explaining she was concerned another student "spent some time in

23

jail[,] could be dangerous, and . . . want[ed] to check and make sure that he[] [was] not near [her] kids." Id. at *2. Henderson repeated similar concerns to other school employees. Id. Henderson was later terminated. Id. at *3.

Although Henderson argued that "her speech addressed a matter of public concern, i.e., the safety of school children and staff," the district court found that the "content, form, and context of [her] speech reveal[ed] that she principally cared about her son rather than the situation of the community in general." Id. at *4. The court noted that the content of Henderson's speech was addressed to keeping the student away from her son, the form of her speech was private and discrete, the motivation of her speech was to protect her son. Id. at *5. Similar to the Eleventh Circuit's reasoning in Morgan, the court explained that the Second Circuit has recognized that "speech that 'principally focuses on an issue that is personal in nature and generally related to the speaker's own situation or that is calculated to redress personal grievances – even if touching on a matter of general importance – does not qualify for First Amendment protection.' " Id. (quotation omitted). The court reasoned that "even if [Henderson] had discussions and concerns about broader school safety at the School District, it was still secondary to [her] parental desire to protect her son" and concluded she did not speak on a matter of public concern. Id. at *5.

Here, Plaintiff's conversations with her children's teachers consisted of asking them to excuse the children from the reading of the book. (Doc. 1 at ¶ 39.) As for Plaintiff's conversations with Defendant Tucker, she describes that she had concerns about the book being read "to her children, so she reached out to the principal asking that her children be exempt." (Doc. 8, Attach. 1 at 14-15.) Although Plaintiff contends that she informed Defendant Tucker during their August 17, 2022, phone conversation that "she believed the book . . . was inappropriate for young children, conflicted with her Christian faith, and appeared to be part of an effort to indoctrinate young children into a progressive ideological agenda," Plaintiff asked Defendant Tucker that her children be excused from the presentation of the book during that call. (Doc. 1 at ¶¶ 41, 42.) In her email that followed, Plaintiff elaborated that she was not "trying to make waves with anyone" and she was "trying to protect her children." (Doc. 1 at ¶ 43; Doc. 1, Attach. 6 at 2.) In the meeting with Defendants Tucker and McNeal that followed, Plaintiff further defined her purpose. Plaintiff explained that "as a Christian mother of children, young children, I don't think that we should be pushing same-sex marriage on my children. I don't like it. I don't agree with it. That has nothing to do with me as a substitute teacher, that's me as a mother protecting my own children." (Doc. 8, Attach. 2 at 9-10.) Later, when discussing the purpose of the meeting, Plaintiff clarified:

"I thought[,] 'there's no reason to discuss this further. I've shared my opinion.' I tried to find, you know, can I prevent my children from being a part of this? 'Yes' or 'no.' " (Id. at 12.) Thus, even crediting that the topic of Plaintiff's speech addressed broader concerns about sexual orientation and public school curriculum, the evidence regarding context currently before the Court suggests Plaintiff was primarily concerned with her children being excused from the read-aloud program, not delving into the propriety of program for all students at MES.

Additionally, the Eleventh Circuit's discussion of context in O'Laughlin is distinguishable. In O'Laughlin, the Eleventh Circuit rejected the district court's conclusion that plaintiffs AJ O'Laughlin and Crystal Little, both captains in the fire department and members of the local firefighter union, did not speak on a matter of public concern when they "accused union officials of conspiring with Fire Department management to misuse member-donated paid time off." 30 F.4th at 1048, 1049. When O'Laughlin ran for the union presidency, he created an invite-only Facebook page and posted a comment accusing the union's vice president "of attempting to misuse, for his personal benefit, time that union members had donated to the Union Time Pool." Id. at 1049. O'Laughlin posted a screenshot of the union Union Time Pool calendar and stated: "This is your Union leadership. Wtf. When elected this will stop." Id. In response, Little commented: "Thanks

26

AJ for keeping them accountable. And on that note our [] stellar staffing officer just blindly approves it? Wtf!" Id. O'Laughlin and Little were disciplined for their comments. Id.

The district court found they did not speak on a matter of public concern, reasoning in part that the context of the speech suggested they were motivated to speak by personal interests in electing O'Laughlin. Id. at 1051. The Eleventh Circuit disagreed and explained that neither the fact that O'Laughlin and Little's speech was " 'motivated' by their personal interest in the outcome of the union election" nor that it "occurred in the context of a union election hardly change[d]" the fact that they "pointedly criticized union leadership." Id. at 1052-53.

In O'Laughlin, the fact that the plaintiffs were personally motivated by interests in the election did not transform their speech, which was about union leadership misusing union time and the union election, to speech on a matter of personal interest. Here, it is not that Plaintiff was motivated by her personal interest in preventing her children from participating in the read-aloud program when she spoke about the broader implications of the read-aloud program; Plaintiff's speech itself primarily addresses her children being exempted from the read-aloud program. Cf. Givhan, 439 U.S. at 412-413, 99 S. Ct. at 695 (noting teacher's statements to principal concerned the school district's racially discriminatory policies). All in all, Plaintiff's inquiries

27

principally addressed her personal concerns about exempting her children from the read-aloud program, and the context of her speech suggests she spoke on a matter of private or personal interest.

Accordingly, having considered the content, form, and context of Plaintiff's statements, Plaintiff has failed to establish a substantial likelihood of success in showing she spoke on a matter of public concern on the evidence currently before the Court. As a result, Plaintiff has also failed to establish a substantial likelihood of success on the merits of her First Amendment retaliation claim.

B.   Free Exercise of Religion

Plaintiff next claims that Defendants violated the Free Exercise Clause by "casting [her] sincerely held religious beliefs as 'biases' and terminating her because of them[.]" (Doc. 8, Attach. 1 at 21.) Defendants point out that Plaintiff's claim rests solely on the premise that Defendants burdened her exercise of her religious beliefs by terminating her for those beliefs, and they argue Plaintiff was terminated for reasons unrelated to her religious beliefs.[9] (Doc. 17 at 10.)

_____

[9] Defendants also assert that "when Section 1983 is used as a parallel remedy for a violation of Title VII, the elements of the two causes of action are the same[,]" and proceed to address the elements of a Title VII employment discrimination claim. (Doc. 17 at 11-12.) In reply, Plaintiff confirms that she has asserted no Title VII claim. (Doc. 18 at 14.) The elements of Title VII and § 1983 claims are the same when "a plaintiff predicates liability under Title VII on disparate treatment **and** also claims liability

The Free Exercise clause of the First Amendment bars a government actor from "prohibiting the free exercise" of religion. U.S. Const. amend. I. To prevail on a Free Exercise claim, a plaintiff must show that the government impermissibly burdened one of his or her sincerely held religious beliefs. Watts v. Fla Int'l Univ., 495 F.3d 1289, 1294 (11th Cir. 2007) (quotation omitted). In the government employment context, the principles derived from the Pickering balancing test for Free Speech claims also apply to Free Exercise claims.[10] Fiedor v. Fla. Dep't of Fin. Servs., 440 F. Supp. 3d 1303, 1311 (N.D. Fla. 2020) (first citing Walden v. Ctrs. for Disease Control & Prevention, 669 F.3d 1277, 1285-86 (11th Cir. 2012); and then citing Shahar v. Bowers, 114 F.3d 1097, 1103 (11th Cir. 1997)). Thus, if a government employer violated an employee's constitutional right by substantially burdening his or her exercise of a sincerely held religious belief, the Court must

---

under sections 1981 and 1983[.]" Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) (emphasis added) (quoting Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir. 1985)).

[10] Citing Justice Clarence Thomas's concurring opinion in Kennedy, 142 S. Ct. at 2433, Plaintiff argues the Court should apply the "unadulterated Free Exercise Clause," not the Pickering balancing test. (Doc. 8, Attach. 1 at 21.) Justice Thomas noted that the Court's opinion did "not resolve two issues related to Kennedy's free-exercise claim[,]" including what "burden a government employer must shoulder to justify restricting an employee's religious expression[,]" and he merely indicated that "the Court [had] never before applied Pickering balancing to a claim brought under the Free Exercise Clause." Kennedy, 142 S. Ct. at 2433. In light of currently binding Eleventh Circuit authority, the Court rejects Plaintiff's argument and applies the Pickering balancing test to Plaintiff's Free Exercise claim.

then engage in Pickering balancing and weigh the employee's rights against the government employer's interest in the efficient and effective provision of services. Walden, 669 F.3d at 1286 (explaining that the court engages in the Pickering balancing test and weighs "the First Amendment rights of the employee . . . against the interests of the government 'as an employer, in promoting the efficiency of the public services it performs through its employees[]' " if a Free Exercise constitutional violation occurs). "To substantially burden means to prevent an individual from engaging in religiously mandated activity, or to require participation in an activity prohibited by religion." Fiedor, 440 F. Supp. 3d at 1312 (quoting Walden v. Ctrs. for Disease Control & Prevention, No. 1:08-cv-2278, 2010 WL 11493832, at *6 (N.D. Ga. Mar. 18, 2010)).

The Court accepts, as Plaintiff alleges, that her sincerely held religious beliefs include "that God created marriage to be between one man and one woman, and that family formation should occur within the confines of heterosexual marriage." (Doc. 8, Attach. 1 at 7-8.) However, at this stage, Plaintiff has not established that she is substantially likely to succeed on showing that Defendants substantially burdened her religious beliefs by terminating her.

It is not clear that Defendants called for Plaintiff's removal due to her religious beliefs. In Walden, plaintiff Marcia Walden's

sincerely held religious beliefs prohibited her from encouraging or supporting same-sex relationships through counseling. 669 F.3d at 1286. As a result, Walden informed a client in a same-sex relationship that her personal values would interfere with their counseling relationship and referred her to another counselor. Id. at 1280-81. Walden refused to tell future clients that she was inexperienced with relationship counseling, rather than stating that her personal values required her to refer the client because that would be lying. Id. at 1281. Walden was removed from her position, and she claimed the employers infringed on her right to free exercise of her religion when they removed her because of her religious need to refer clients seeking same-sex relationship counseling to another counselor. Id. at 1282, 1285.

On appeal, even assuming Walden's "sincerely held religious beliefs prohibit[ed] her from encouraging or supporting same-sex relationships through counseling[,]" the Eleventh Circuit concluded the employers did not violate Walden's constitutional rights because they did not burden her sincerely held religious belief. Id. at 1286. Rather than removing her "due to her religiously-based need to refer clients who needed same-sex relationship counseling[,]" they removed her out of concern for the manner she handled the client's referral and how she would handle future referrals. Id. Here too, Defendants maintain they removed Plaintiff due to her inappropriately timed interactions

31

with her children's teachers and concern about how she would support students or parents that identify as gay, not because of her beliefs about marriage and family formation. (Doc. 8, Attach. 2 at 8; Doc. 17, Attach. 1 at 1-2, 3.) Accordingly, given the evidence currently before the Court, Plaintiff has not established that she is substantially likely to succeed on the merits of her Free Exercise claim.

## CONCLUSION

For the foregoing reasons, Plaintiff is not entitled to a preliminary injunction, and Plaintiff's motion (Doc. 8) is **DENIED**. Additionally, Plaintiff's request for a hearing (Doc. 16) is **DENIED**.

SO ORDERED this 21st day of February 2023.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA